```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
C.V. Starr & Co., Inc. and                          :
C.V. Starr & Co.,                                   :
                                                    :
        Plaintiffs,                                 :
                                                    :
        -against-                                   :       06 Civ. 2157 (HB)
                                                    :
American International Group, Inc.,                 :
                                                    :       OPINION & ORDER
        Defendant-Counterclaim Plaintiff,           :
                                                    :
        -against-                                   :
                                                    :
C.V Starr & Co., Inc., Starr Technical              :
Risks Agency Inc., and                              :
Starr Associates, Inc.                              :
                                                    :
        Counterclaim Defendants.                    :
------------------------------------------------------X
```

**Hon. Harold Baer, Jr., District Judge:**

      Plaintiffs C.V Starr & Co., Inc. and C.V. Starr & Co. ("CV Starr California") (collectively, "CV Starr") allege claims for, *inter alia*, trademark infringement and "cybersquatting" under the Lanham Act, 15 U.S.C. § 1125, as well as common law conversion against defendant American International Group, Inc. ("AIG"). AIG has counterclaimed for, *inter alia*, trademark infringement and unfair competition. CV Starr seeks a preliminary injunction transferring control of the internet site "cvstarr.com" from AIG to CV Starr. The parties appeared at a hearing on this motion on May 2, 2006. For the reasons that follow, CV Starr's motion is GRANTED in part.

## BACKGROUND

      This litigation stems from the demise of the longstanding business relationship between CV Starr and AIG. Cornelius Vander Starr (the namesake of CV Starr) founded the first domestic corporation to use the "American International" brand in 1926. (Declaration of Ralph Mucerino, dated April 20, 2006 ("Mucerino Dec.") ¶ 3, 5). Mr. Starr founded CV Starr & Co., Inc. in 1950. (Id. ¶ 6; Affirmation of Kenneth A. Plevan,

1

dated April 20, 2006 ("Plevan Aff.") ¶ 10). In 1970, AIG purchased most of the assets of CV Starr & Co., Inc. in exchange for AIG stock. (Mucerino Dec. ¶ 10). However, CV Starr & Co., Inc. retained ownership of several "managing general agencies" that "underwrite and manage various specialty lines of insurance." (Plevan Aff. ¶ 11). According to AIG, a managing general agent "is an agent authorized by an insurance company to manage all or part of an insurer's business, often in a specific geographic territory and/ or for a particular class of insurance." (Mucerino Dec. ¶ 12). These agencies consisted of plaintiff CV Starr California, Starr Technical Risks Agency, Inc., Starr Associates, Inc., American International Aviation Agency, and American International Marine Agency, Inc. (collectively, the "CV Starr Agencies"). CV Starr California shared office space with AIG in San Francisco, Los Angeles and Seattle. (Affirmation of Daryl J. Dusich, dated April 20, 2006 ("Dusich Aff.") ¶ 8). Until just recently, the CV Starr Agencies acted as managing general agents for AIG member companies pursuant to written management agreements. (Mucerino Dec. ¶ 10; Pl.'s Ex. 15).[1] CV Starr California's agency contract with AIG will terminate on May 14, 2006. (Dusich Aff. ¶ 14).

The precise nature of the past relationship between the CV Starr Agencies and AIG is disputed. The CV Starr Agencies' primary business relationships were with insurance brokers, who dealt directly with the ultimate policy holders. (Reply Affirmation of Daryl J. Dusich, dated April 28, 2006 ("Dusich Reply Aff.") ¶¶ 11-13). AIG asserts that the CV Starr Agencies "were typically limited in the amount of liability they could assume on any one risk, were required to obtain approval from . . . AIG . . . for underwriting and producer guidelines [that CV Starr] created, and were excluded from writing certain classes of risk." (Id. ¶ 13). According to AIG, it "would typically retain the right to cancel or not renew any policy written by" the CV Starr Agencies. (Id. ¶ 14). However, CV Starr contends that AIG never had the right to cancel or not renew CV Starr California's excess liability policies. (Dusich Reply Aff. ¶ 8).

AIG contends that, "notwithstanding their nominal ownership by [C.V. Starr & Co., Inc], the [CV Starr Agencies] . . . have essentially been operating divisions or arms

---

[1] American International Marine Agency, Inc. continues to operate as a managing general agent to AIG member companies. (Declaration of Robert L. Raskopf, dated April 26, 2006 ("Raskopf Dec.") ¶ 2).

2

of AIG for at least the past 30 years or more." (Mucerino Dec. ¶ 18). AIG asserts that it ran the CV Starr Agencies' employee benefits programs and computer systems, supervised and evaluated the CV Starr Agencies' employees, and approved the CV Starr Agencies' budgets and business plans. (Id. ¶¶ 18-22). (See also Declaration of Robert J. Penny, dated April 26, 2006 ("Penny Dec.") ¶ 7). Thus, AIG claims that the CV Starr Agencies "have no identity in the marketplace that is independent of that which is derived from AIG." (Mucerino Dec. ¶ 29).

CV Starr argues that, "[a]t a minimum" this characterization is incorrect with respect to CV Starr California, since that entity does have "an 'independent identity' outside of its contractual role as managing agent for AIG" and in fact is "a competitor of AIG with respect to certain types of insurance coverages." (Dusich Reply Aff. ¶ 7). Plaintiffs assert that CV Starr California writes insurance for non-AIG entities. (Id.) In support of its claim of independence, CV Starr also relies on an August 14, 2003 report issued by a special committee of AIG's board of directors that was convened to investigate allegations of self-dealing at AIG. (Pls.' Ex. 19). While hardly a disinterested team, this internal investigation sheds some light on the role of the CV Starr Agencies. The report concluded, *inter alia*, that AIG paid fair commissions to the CV Starr Agencies, that the CV Starr Agencies had "an exemplary reputation in their industry," and that AIG lacked the necessary "expertise or resources" to generate business in CV Starr's "niche markets." (Pls.' Ex. 19 at 5, 7, 60-61).

CV Starr California has a federal registration for the trademark "C.V. STARR & CO." (Plevan Aff. ¶ 10). CV Starr also owns a design mark for "C.V. STARR & CO." as well as design marks for "STARR TECHNICAL RISKS AGENCY, INC." and "STARR TECH". (Declaration of Elizabeth Pearce, dated April 25, 2006 ("Pearce Dec.") ¶ 5). CV Starr's registrations were filed by AIG employees, and AIG charged CV Starr a fee for these services. (Pearce Dec. ¶ 6). AIG also holds registrations for various marks containing the designation "STARR EXCESS." (Id. ¶ 5). These marks are held by AIG pursuant to a June 29, 1993 license agreement between CV Starr and Starr Excess Liability Insurance Company, Ltd., a wholly owned subsidiary of AIG. (Pls.' Ex. 14). AIG, however, argues that this license agreement was a sham because it provided for only nominal royalties, conferred limited termination rights, was of perpetual

3

duration, and lacked any provision for quality control. (Id.; Transcript of Oral Argument dated May 2, 2006, at 29-32). Thus, it is AIG's position that it owns these marks free and clear.

        The domain name "cvstarr.com" was originally registered by CV Starr California "in or about" 1995. (Plevan Aff. ¶ 3). In June of 2002, the domain name registration was transferred to AIG. (Id. ¶ 4; Dusich Aff. ¶ 9). CV Starr contends that the transfer was effectuated in order to provide AIG with access to the website in order to complete a redesign project. (Dusich Aff. ¶¶ 7-9; Reply Affirmation of Jeffrey Hafter, dated April 28, 2006 ("Hafter Reply Aff.") ¶ 4). However, AIG contends that the domain name was transferred pursuant to a pre-existing corporate policy by which AIG consolidated the trademark registrations of all affiliated websites in AIG's "Corporate eBusiness" department. (Declaration of Thomas Kelly, dated April 26, 2006 ("Kelly Dec.") ¶¶ 3-13). In any case, no redesign project was ever completed. (Dusich Aff. ¶ 10). CV Starr asserts that it will suffer irreparable harm if the website remains under AIG's control after CV Starr California's relationship with AIG terminates on May 14, 2006.

## DISCUSSION

        "To obtain a preliminary injunction, . . . [CV Starr] must establish: (1) the likelihood of irreparable injury in the absence of such an injunction, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly in [the movant's] favor. Mallatier v. Burlington Coat Factory Warehouse Corp., 426 F.3d 532, 537 (2d Cir. 2005) (internal quotation omitted). "However, . . . [a] movant [must] meet a higher standard where: (i) an injunction will alter, rather than maintain, the status quo, or (ii) an injunction will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits." Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc., 60 F.3d 27, 33-34 (2d Cir. 1995).

        While the "typical preliminary injunction is prohibitory and generally seeks only to maintain the status quo pending a trial on the merits . . . . [a] mandatory injunction . . . alter[s] the status quo by commanding some positive act." Id. at 34 (internal citations

4

omitted). To obtain a "mandatory" injunction, plaintiff must make "'a clear showing that [it] . . . is entitled to the relief requested, or [that] extreme or very serious damage will result from a denial of preliminary relief.'" Id. (quoting Abdul Wali v. Coughlin, 754 F.2d 1015, 1025 (2d Cir. 1985)). However, "[d]etermining whether the status quo is to be maintained or upset has led to distinctions that are 'more semantic than substantive.'" Id. (quoting Wali, 754 F.2d at 1025). Mandatory injunctions may be stated in prohibitory terms, or vice versa. Id. Thus, the proper inquiry is whether the requested relief alters or maintains pre-existing circumstances. See Do The Hustle, L.L.C. v. Rogovich, No. 03 Civ. 3870, 2003 WL 21436215, *8 ("the burden upon the moving party is heightened when the movant seeks to disturb the status quo by [obtaining] affirmative relief, as opposed to preserving the status quo by prohibiting the non-movant from altering the status quo") (internal quotation omitted).

In support of its motion, CV Starr alleges claims for trademark infringement and cybersquatting under the Lanham Act (the "Act"), 15 U.S.C. § 1125, as well as common law conversion.² To succeed on a claim for trademark infringement in this context, CV Starr must show that "it has a valid mark that is entitled to protection under the . . . Act and that . . . . the defendant's actions are 'likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association' of the defendant's goods or services with those of the plaintiff[s']." The Sports Auth., Inc. v. Prime Hospitality Corp., 89 F.3d 955, 960 (2d Cir. 1996) (quoting 15 U.S.C. § 1125(a)(1)(A)). Registration of a mark is prima facie evidence of the mark's validity. See 15 U.S.C. § 1115(a). In addition, "in the preliminary injunction context, a showing of likelihood of confusion as to source or sponsorship establishes the requisite likelihood of success on the merits as well as risk of irreparable harm." Home Box Office, Inc. v. Showtime/ The Movie Channel, Inc., 832 F.2d 1311, 1314 (2d Cir. 1987) (internal quotation omitted).

Here, AIG concedes that confusion in the marketplace is inevitable. (See AIG's Memorandum in Opposition, dated April 26, 2006 ("AIG Mem."), at 22). However, AIG contends that it is the "rightful owner" of the "C.V. STARR & CO." mark and that, therefore, AIG will suffer harm if the "cvstarr.com" website is transferred to CV Starr

---

² Because, as set forth below, I find that CV Starr has made a sufficient showing to justify a preliminary injunction based on to its claim for trademark infringement, I need not address the viability of plaintiffs' claims for cybersquatting or conversion.

5

California.  In support of its argument, AIG asserts that "whoever controls the quality of . . . goods marketed under [a] trademark is the source and therefore owns the trademark." Liebowitz v. Elsevier Science Ltd., 927 F. Supp. 688, 696 (S.D.N.Y. 1996).  Since "the public . . . relies on [a] trademark as a sign that the goods sold under that trademark are of the same quality as goods that it has purchased from that source before . . . . ownership of the marks . . . [depends on] who controls the quality of the goods."  Id. at 695-96.  See also In re Polar Music Int. AB, 714 F.2d 1567, 1571 (Fed. Cir. 1983) (finding that corporation that controlled the quality of sound recordings for a rock band was "source" of those recordings and thus was entitled to register name of band for use on albums).

AIG argues that, because it treated CV Starr as a subsidiary for decades and exerted significant control over CV Starr's operations, it in effect controlled the quality of CV Starr's services.  Further, AIG contends that CV Starr has no presence in the marketplace separate and apart from AIG.  CV Starr, of course, thinks otherwise.  CV Starr asserts that it does enjoy independent market recognition, a view apparently shared by the special committee of AIG's board that reported on the relationship between CV Starr and AIG.  (See Pls.' Ex. 19).  Even if, with the benefit of full discovery, AIG's view prevails, it is far from certain that the "quality control" doctrine expressed in Liebowitz will prove applicable here.  Unlike tangible products, it would be difficult to determine that one of two closely affiliated entities is singularly responsible for the quality of insurance services, e.g. underwriting, that is provided to customers.  In any case, at this juncture I need not determine whether CV Starr or AIG will ultimately prove to be entitled to the contested marks.

A transfer of control of the "cvstarr.com" site would, arguably, constitute a change in the "status quo" sufficient to implicate the heightened burden of a mandatory injunction.  However, an injunction preventing AIG from using the "cvstarr.com" site after May 14th, pending resolution of this litigation, would not.  Currently, the "cvstarr.com" site contains contact information (including AIG email addresses) for CV Starr California employees, and states that CV Starr California writes insurance for AIG member companies.  (Pls.' Exs. 1, 6).  Indeed, most of the information on the site will be outdated and incorrect as of May 14th, when CV Starr California's relationship with AIG terminates and CV Starr California vacates the office space it has shared with AIG.

(Dusich Aff. ¶¶ 19-20; Plevan Aff. ¶ 12). Indeed, AIG concedes that it will have to update inaccurate information on the "cvstarr.com" site after May 14th. (See AIG Mem. at 12-13). The website does not and never has contained any information about AIG (except as pertains to its past relationship with CV Starr California). (Dusich Aff. ¶ 11). Conversely, CV Starr California maintains a separate website at "cvstarrco.com." (Plevan Aff. ¶ 27).[3] Thus, an injunction that prevents AIG from operating the site after it has separated from CV Starr California would effectively maintain the status quo.

To obtain an injunction, CV Starr must demonstrate irreparable harm as well as serious questions going to the merits of the litigation and a balance of hardships in CV Starr's favor. See Mallatier, 426 F.3d at 537. Notwithstanding the fact that a showing of likelihood of confusion establishes the requisite risk of irreparable harm, see Home Box Office, 832 F.2d at 1314, CV Starr has demonstrated that consumers searching for CV Starr's website after May 14th could easily be misdirected to "cvstarr.com" rather than to CV Starr's current site at "cvstarrco.com". (See Plevan Aff. ¶ 27 (attesting that internet searches for "C.V. Starr" produce the "cvstarr.com" website)). Thus, even if AIG removed inaccurate information from the site, customers seeking CV Starr could still mistakenly contact AIG. AIG, however, maintains numerous websites apart from "cvstarr.com," (see Kelly Dec. ¶¶ 9-10), so there is little danger that customers seeking to contact AIG will be unable to do so. Therefore, CV Starr has adequately demonstrated irreparable harm as well as a balance of hardships in its favor.

---

[3] The only difference between the names of the two sites is the addition of "co" after "cvstarr" to create "cvstarrco.com." After May 14th, customers should be able to locate CV Starr California at "cvstarrco.com." Thus, it appears that CV Starr California will suffer little hardship as a result of its inability to access the "cvstarr.com" site pending the resolution of this litigation. Indeed, CV Starr represented that, if it were to regain control of the site, its "first step [would] be to shut down" the site until the information contained therein could be updated. (Dusich Reply Aff. ¶ 15).

## CONCLUSION

For the foregoing reasons, CV Starr's motion for a preliminary injunction is GRANTED in part. AIG is ordered to remove all content from the website "cvstarr.com" by May 14th and cease its operation of that site pending further order of the Court. The parties are directed to appear in my chambers for a pretrial scheduling conference on May 25, 2006 at 2:45 p.m. Insofar as AIG has requested expedited discovery, discovery may commence immediately. Any further issues relating to scheduling or discovery may be addressed at the pretrial conference. The Clerk of the Court is directed to close this motion and remove it from my docket.

**SO ORDERED.**

May 9, 2006
New York, New York

_____
U.S.D.J.